**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| LOUISIANA SHRIMP ASSOCIATION;<br>JOHN BROWN,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; GINA RAIMONDO, in her official capacity as UNITED STATES SECRETARY OF COMMERCE; NATIONAL MARINE FISHERIES SERVICE,<br><br>Defendants. | ) | Civil Action No. 2:24-cv-156<br><br>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF** |

**INTRODUCTION**

1. This action for declaratory judgment and injunctive relief seeks a remedy for the baseless actions of faraway Washington bureaucrats that are financially crushing Louisiana shrimpers in violation of the requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 and the Constitution.

2. Specifically, bureaucrats at the National Marine Fisheries Service ("NMFS") have implemented a rule that arbitrarily and capriciously discriminates against skimmer trawl vessels 40 feet and longer by requiring them to install and use expensive, custom-made equipment called Turtle Excluder Devices ("TEDs") in an attempt to minimize the number of turtles accidentally caught in these boats' nets. But these bureaucrats ignored data showing 1) the devastating financial impact the rule would have on Louisiana shrimpers and 2) the complete lack of environmental threat facing inshore turtles – *as only two documented interactions with sea turtles have occurred in 55 years and neither was harmed* – and turtle nests are thriving.

3. Previously, these boats had a highly effective alternative. Until 2019, all skimmer trawl vessels 40 feet and longer in length—a significant portion of shrimp boats operating in Louisiana's inshore waters—were subject to tow-time restrictions. But in 2019, NMFS issued a final rule eliminating that alternative and requiring all such skimmer trawl vessels in inshore waters to use TEDs. Sea Turtle Conservation; Shrimp Trawling Requirements, 84 Fed. Reg. 70,048 (Dec. 20, 2019) ("2019 Final Rule"). NMFS delayed implementation of the 2019 Final Rule until April 1, 2021, in part based on the limited number of TEDs that net shops could build and install for shrimpers to comply with the 2019 Final Rule. On March 31, 2021, NMFS again delayed the effective date until August 1, 2021, citing safety and travel restrictions due to the COVID-19 pandemic that limited Defendants' ability to complete in-person workshops and training sessions that it typically provided and had promised to members of the industry and the public in a Fishery Bulletin. Sea Turtle Conservation; Shrimp Trawling Requirements, 86 Fed. Reg. 16,676 (March 31, 2021) ("March 2021 Delay Rule"). However, despite a request from the Louisiana Department of Fish and Wildlife for the NMFS to delay the rule again in light of continuing challenges, the Defendants refused to delay the Final Rule's effective date and Plaintiffs have paid the price.

4. Defendants have violated the APA by (1) failing to show the need for a new rule without any evidence that sea turtles inhabit Louisiana's inshore waters and thereby encounter skimmer trawls, (2) refusing to consider relevant data supporting an exclusion zone for inshore waters of Louisiana despite the State of Louisiana's request for an exclusion zone, and (3) ignoring significant industry reliance interests by the shrimpers. Despite the Endangered Species Act's command that Defendants use the best available science, Defendants ignored data—and cited inapplicable coastal data and the absence of data—as evidence for the need to protect non-existent

sea turtles. Those failures contravened the APA's reasoned-decision-making requirements. *See, e.g., Music Choice v. CRB*, 970 F.3d 418, 429 (D.C. Cir. 2020).

5. The Final Rule is substantively arbitrary and capricious because NMFS eliminated previous tow-time restrictions for inshore skimmer trawl vessels and required skimmers to use TEDs where shrimpers *do not interact with sea turtles*. The Final Rule ignored decades of contrary agency findings and the serious reliance interests of the Louisiana shrimping industry – which is poised to potentially lose millions of dollars and up to half of its fleet because of the operational costs of this change.

6. Plaintiff Louisiana shrimpers seek a setting aside and vacatur of the 2019 Final Rule and an injunction against its continued enforcement.

**PARTIES**

7. Plaintiff Louisiana Shrimp Association is a nonprofit organization formed by commercial shrimpers throughout the State of Louisiana. Membership consists of commercial shrimp fisherman, wholesale and retail seafood dealers, statewide merchants, and individuals concerned about issues related to domestic seafood and shrimp production as well as the preservation of the culture and heritage of the traditional Louisiana shrimper. Membership includes operators of shrimp boats which are over 40 feet in length and to whom the Final Rule applies. It is headquartered at 42941 Highway 23, Venice, LA 70091-4209, Plaquemines Parish. Acy Cooper, Jr., is its President, and a lifelong Louisiana shrimper himself.

8. Plaintiff John Brown is a lifelong Louisiana shrimper to whom the Final Rule applies. Mr. Brown's has spent a lifetime of hard work to purchase and build his shrimp boat, which is over 40 feet long. Since the Final Rule went into effect, Mr. Brown has had to expend significant sums in ordering and installing custom TEDs. Installation and operation of the TEDs takes Mr. Brown and his crew significant time that could otherwise be used shrimping, and the

TEDs diminish the amount of shrimp that Mr. Brown catches. Mr. Brown lives in Lafitte, Louisiana.

9. Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

10. Defendant Gina Raimondo is the United States Secretary of Commerce. She is sued in her official capacity.

11. Defendant National Marine Fisheries Service ("NMFS") is an office within NOAA to which NOAA has delegated authority to administer and implement the Endangered Species Act with respect to sea turtles in the marine environment, including promulgating regulations for conservation. NMFS is responsible for complying with the Endangered Species Act when taking any action that may affect threatened or endangered species.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution of the United States and federal law.

13. This Court has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the United States.

14. This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs.

15. This Court has jurisdiction to review Defendants' unlawful actions and inactions and enter appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§ 701- 706.

16. This Court has jurisdiction to review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-92 (1949).

17. This Court has authority to award the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 2202; and award costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are officers and employees of the United States and agencies of the United States, and a substantial part of the events or omissions giving rise to the claims occurred within this district and/or all Plaintiffs reside in the Eastern District of Louisiana. The proximity of the Eastern District of Louisiana to their headquarters and abode makes that venue the most convenient for Plaintiffs.

## FACTUAL BACKGROUND

### The Statutory Framework

19. The Administrative Procedure Act ("APA") waives the sovereign immunity of the United States and its federal agencies for challenges to final agency action that seek relief other than monetary damages. It enables parties who are adversely affected or aggrieved by agency action to seek judicial review thereof. 5 U.S.C. §§702, 704.

20. Under the APA, a court will set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

21. The Endangered Species Act ("ESA") seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors and requiring federal agencies to take certain actions based on that listing.

22. Section 7 of the ESA requires each federal agency, in consultation with the appropriate wildlife agency—here, NMFS—to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species. 16 U.S.C. §1536(a)(2).

23. Congress made clear, however, that the ESA is a cooperative federalism scheme. "It is . . . the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species." 16 U.S.C. §1531(c)(2). That policy is implemented via a mandatory provision: "In carrying out the program authorized by this chapter, the Secretary shall cooperate to the maximum extent practicable with the States." 16 U.S.C. §1535(a).

**The 1987 Rulemaking**

24. In 1987, the Secretary of Commerce proposed rules to require shrimp trawlers in the Gulf of Mexico and the Atlantic Ocean off the coast of the Southeastern United States to use so-called turtle excluder devices ("TEDs") in specified locations and at specified times to reduce incidental captures of endangered and threatened species of sea turtles. Sea Turtle Conservation; Shrimp Trawl Requirements, 52 Fed. Reg. 6,179 (Mar. 2, 1987) ("1987 Proposed Rule").

25. Noting "the likely limited . . . availability of sufficient TEDs" in certain areas, the 1987 Proposed Rule called for phasing-in use of TEDs. 52 Fed. Reg. at 6,181. The 1987 Proposed Rule called for TEDs to be used beginning July 15, 1987, "in the inshore areas of Breton and Chandeleur Sounds of Louisiana (March through November)," with inshore defined as "marine or tidal waters landward of the baseline from which the territorial sea of the United States is measured." *Id.* at 6,180, 6,183. Ultimately, however, the 1987 Proposed Rule called for TEDs to be used by "shrimp trawlers fishing in all . . . inshore waters off southwestern Florida and from Mobile Bay westward to the Mexican border" beginning July 15, 1988. *Id.* at 6,181. The 1987 Proposed Rule went on to explain that "[i]n general, shrimp trawlers fishing in these waters are smaller than offshore trawlers and typically drag their nets for shorter times. That fact, and the likely limited earlier availability of sufficient TEDs for the many shrimp trawlers in these waters,

warranted the postponement of required TED use in these inshore areas until mid-1988." *Id.* The 1987 Proposed Rule also called for a blanket exemption for shrimpers trawling in areas where "turtles are rarely encountered" and "vessels using small nets [that] tow for relatively short periods, thus reducing the risk that turtles might drown." *Id.* at 6,181-82.

26. The Secretary of Commerce thereafter published a final rule. Sea Turtle Conservation; Shrimp Trawling Requirements, 52 Fed. Reg. 24,244 (June 29, 1987) ("1987 Final Rule"). NOAA and NMFS noted that they had received thousands of comments on the 1987 Proposed Rule and the associated Draft Supplemental Impact Statement. Two areas of comment are particularly relevant here.

27. First, in response to comments that "TEDs would not allow turtles to escape because they would get caught in the TEDs, especially if the TED was clogged or jammed," NMFS acknowledged "that TEDs *have not been tested for turtle exclusion in inshore waters*, where shrimpers contend that *clogging problems will be the worst*." 52 Fed. Reg. at 24,246 (emphases added). "The final regulations [accordingly] do not require shrimpers to use TEDs in inshore waters," and [t]ow time restrictions are substituted for the TED requirement." *Id.*

28. Second, NMFS responded to comments that "[t]he available data do not support the proposed regulations," and that "[m]any of the commenters, including some members of Congress and State officials, stated that NMFS should have stronger evidence that shrimp trawling results in significant turtle mortality." 52 Fed. Reg. 24,246. NMFS acknowledged the limited data underlying the 1987 Final Rule:

> *NMFS is aware of the limited scientific data on the incidental mortality of sea turtle and TED effectiveness in certain areas, particularly inshore waters.* There is however a good data base for offshore areas in the southeast United States, showing that more than 11,000 sea turtles die in shrimp trawls each year. Because of this disparity, NMFS agrees that it is not appropriate at this time to require TEDs to be used in both inshore and offshore waters by all shrimp trawlers.

*Id.* (emphasis added). Instead, NMFS decided to "require the use of TEDs in offshore waters for all shrimp trawlers 25 feet and longer and [to] restrict tow times for smaller shrimp trawlers in offshore waters and for all shrimp trawlers in inshore waters to 90 minutes or less." *Id.* at 24,247.

**Rule Withdrawal**

29. In May 2012, NMFS and NOAA proposed withdrawing the alternative tow-time restriction and requiring all skimmer trawls, pusher-head trawls, and wing nets (butterfly trawls) rigged for fishing to use TEDs in their nets. Sea Turtle Conservation; Shrimp Trawling Requirements, 77 Fed. Reg. 27,411 (May 10, 2012) ("2012 Proposed Rule"). The claimed impetus for the 2012 Proposed Rule was "elevated sea turtle strandings in the northern Gulf of Mexico," although NMFS "noted that stranding coverage has increased considerably due to the [Deepwater Horizon] oil spill event, which has increased the likelihood of observing stranded animals," i.e., year-over-year data wasn't comparable. *Id.* at 27,412. According to NMFS, a draft environmental impact statement ("DEIS") "demonstrate[d] that withdrawing the alternative tow time restriction and requiring all skimmer trawls, pusher-head trawls, and wing nets rigged for fishing to use TEDs in their nets would reduce incidental bycatch and mortality of sea turtles in the southeastern U.S. shrimp fisheries." *Id.* at 27,412.

30. NMFS estimated the devastating costs to shrimpers in installing the TEDs and in continued losses of catch while operating with the TEDs. Complying with the 2012 Proposed Rule would subject affected Louisiana shrimpers to an average first-year cost of $2,120, i.e., approximately 9.4 percent of average annual shrimp revenue for affected Louisiana shrimpers. 77 Fed. Reg. at 27,414. NMFS went on to admit "the estimated average annual net revenue across all Gulf States, including revenue from all species, for operations in the inshore shrimp sector, which includes the entities described here, is negative, indicating the average vessel is operating at a

loss." *Id.* "As a result, any increased costs or reduced revenues are expected to compound these losses." *Id.*

31. The next year, NMFS withdrew the 2012 Proposed Rule. Sea Turtle Conservation; Shrimp Trawling Requirements, 78 Fed. Reg. 9,024 (Feb. 7, 2013) ("2013 Withdrawal"). NMFS's explanation for reversing course was that "[b]ased on new information . . . [its] previous conclusions regarding the impact of non-compliance with tow time restrictions in the skimmer trawl fleet were likely overly conservative and the DEIS mortality estimates likely do not reflect actual fishery impacts on sea turtles." *Id.* at 9,025. NMFS elaborated:

> At the time the DEIS was prepared, we had extremely limited information on the effects of the skimmer trawl fisheries on sea turtle populations. During this past summer, we shifted observer effort from the offshore otter shrimp trawl fishery to the inshore skimmer trawl fisheries in the Northern Gulf of Mexico to obtain more information on the potential impacts to sea turtle populations. Between May and July 2012, observers reported the capture of 24 sea turtles on skimmer trawl vessels . . . . Tow times ranged from 24 to 128 minutes, with approximately 20 percent being over 70 minutes, with an average tow time of 57 minutes. While only 35 percent of tows were within the required 55-minute tow time limit, all sea turtles were released alive. One turtle was initially comatose but became active while on deck before release. Additionally, all observed sea turtles were small, juvenile specimens, and approximately 58 percent of these turtles had a body depth that could allow them to pass between the required maximum 4-inch bar spacing of a TED.
>
> * * * * *
>
> In contrast to the estimates included in the DEIS, the revised capture and mortality estimates indicate that the potential benefits of a TED requirement in the Gulf of Mexico skimmer trawl fisheries are significantly less than previously estimated in the DEIS. Therefore, *given the potentially significant economic ramifications a TED requirement would have on fishermen participating in the inshore skimmer trawl fisheries combined with highly uncertain ecological benefits to sea turtle populations compared to the status quo based on the new observer data*, we concluded a final rule to require all skimmer trawls, pusher-head trawls, and wing nets (butterfly trawls) in the Gulf of Mexico to use TEDs in their nets is not warranted at this time[.]

*Id.* (emphasis added).

32. NMFS went on to explain that it "expect[ed] to improve outreach efforts with industry to address compliance issues with tow time requirements observed in the inshore skimmer trawl fisheries." 78 Fed. Reg. at 9,026. "Numerous requests to strengthen outreach, specifically in regards to education on tow time requirements, were received from the public and industry during the comment periods for the proposed rule and DEIS." *Id.* These outreach efforts would "likely improve compliance and, therefore, decrease sea turtle mortality in the inshore skimmer trawl fisheries in the near term." *Id.*

**The 2014 Opinion**

33. In 2014, Defendants completed an ESA Section 7 consultation and issued an opinion on shrimp trawling in the southeastern United States. The consultation was triggered by the November 26, 2012, decision to not require TEDs in skimmers as proposed. Defendants concluded that allowing shrimp fisheries to continue as permitted under the existing regulations was not likely to jeopardize the continued existence of any listed species.

**The 2016 Rulemaking and 2019 Final Rule**

34. In 2016, NMFS once again announced it was considering withdrawing the alternative tow-time restriction and requiring all skimmer trawls, pusher-head trawls, and wing nets (butterfly trawls) rigged for fishing to use TEDs designed to exclude small turtles in their nets. Sea Turtle Conservation; Shrimp Trawling Requirements, 81 Fed. Reg. 91,097 (Dec. 16, 2016) ("2016 Proposed Rule"). NMFS stated that its intent was to reduce incidental bycatch and mortality of sea turtles in the southeastern U.S. shrimp fisheries, and to aid in the protection and recovery of listed sea turtle populations.

35. NMFS's economic analysis indicated the devastating effect a TED rule would have on the shrimpers. "The average annual gross revenue (2014 dollars) over the period 2011-2014 for vessels that harvested shrimp using skimmer trawls, pusher-head trawls, or wing nets (butterfly trawls) was approximately $31,861 for vessels in the Gulf of Mexico (5,660 vessels)." 81 Fed. Reg. at 91,100. NMFS estimated "Gulf of Mexico vessels would be expected to experience average adverse effects of $1,085, $1,298, and $2,383 with respect to lost gross revenue, TED costs, and the total adverse effect, respectively." *Id.* at 91,101.

36. NMFS conceded that "a general economic assessment utilizing gross revenue and operating cost information suggests that the financial conditions for many vessels are and have been poor," with "vessels . . . already operating on small economic margins." 81 Fed. Reg. at 91,100, 91,102. Indeed, NMFS's economic analysis "suggest[ed] that a high number of the part-time vessels may not continue operating as a result of [the 2016 Proposed Rule]." *Id.* at 91,102. NMFS also suggested its economic analysis understated the impact: "Upward price pressure on TEDs will be affected by the number of available suppliers (there are currently six), their capacity to meet production demand (each can currently produce 20 TEDs per week), the timeframe for compliance, and the total number of TEDs needed (estimated to be 23,266 in order to fully outfit all of the vessels directly regulated by this proposed rule)," and "if the price of a TED increases, then the adverse economic effects associated with the costs of purchasing TEDs will be understated." *Id.* at 91,101.

37. The Louisiana Shrimp Association ("LSA") submitted a comment on the 2016 Proposed Rule voicing opposition to the proposed rule, attached hereto as Exhibit 1.

The LSA noted the dramatic adverse economic effects of the rule, both in the short and long terms: "Average 1st Year Revenue Loss would range between $9.4 million to $44 million without considering that NOAA admits that it is a 'high probability' that more than 50% of part-time shrimper vessels 'will stop operation due to TED costs.'" *Id.* at 1. "A loss of just 30-50% annual gross revenue due to the massive decline in part-time shrimping vessels predicted by NOAA as a result of the new TED requirements, if projected upon the entire gross annual shrimp income, would result in a $390-650 million direct economic loss and, potentially, a permanent loss of 4,500-7,500 jobs." *Id.* at 3.

38. The LSA pointed out that NOAA's Environmental Impact Statement shows that turtle populations – the ostensible reason for the new requirements – have reached historic heights. Green Sea Turtle nesting has gone from less than 1,000 in 1989 to nearly 30,000 in 2015, Kemp Ridley Turtle nests have increased from 1,000 in 1978 to 15-20,000 in 2011-2015 despite the BP oil spills effects, and Leatherback Turtle nesting has gone from 50 in 1989 to 600 before the BP oil spill. *Id.* at 4-5. "NOAA's own data clearly shows that turtle populations have thrived under the current regulatory practices which allow skimmer shrimping vessels to operate without TEDs."

39. LSA pointed out that the NOAA's data shows that vessels equipped with TEDs actually "had three (3) times the turtle mortality rate compared to skimmer vessels." *Id.* at 8-9. Furthermore, these vessels had the potential for significant "safety at sea" issues such as a TED "clogged by debris or net entanglement in the motor due to a lengthened net to accommodate the TED extension." *Id.* at 9. LSA urged the regulators to continue operation of the current regulatory scheme.

40. The State of Louisiana's Louisiana Department of Wildlife and Fisheries ("LDWF") also submitted a comment on the 2016 Proposed Rule voicing opposition to the proposed rule based on data collected in the region. LDWF began by noting the finding in NMFS's DEIS that "[a]ccurate population estimates for marine turtles do not exist because of the difficulty in sampling turtles over their geographic ranges and within their marine environments." LDWF then urged that NMFS's "[e]xtrapolating the skimmer trawl data to estimate incidental captures of sea turtles in the combined skimmer trawl, wing net, and pusher-head trawl fishery is inappropriate." LDWF also noted that sea turtle "[n]esting trends and nester abundance are on the rise, with record nesting numbers in some areas and a recent down-listing of the green sea turtle under the Endangered Species Act from endangered status to threatened status." "Given the general upward trend of nesting and nesters as indicated in the DEIS, skimmer trawl, wing net, and pusher-head trawl fishing does not seem to negatively affect the recovery of these species."

41. Regarding the economic impact of the 2016 Proposed Rule, LDWF explained:

> Louisiana leads the nation in domestic shrimp production. Skimmer trawls, most commonly used in Louisiana, account for a significant amount of Louisiana's shrimp landings, about 41 percent of the total from 2000-2013. As such, the proposed rule would disproportionately adversely impact Louisiana's shrimping industry, fishing communities, and economy. More observer and socioeconomic impact data are needed to support these proposed regulatory changes. Furthermore, reductions to incidental bycatch and mortality of sea turtles in this fishery can be achieved through other means with significantly less impact on Louisiana's communities and economy.
>
> * * * * *
>
> Reducing gross revenue and adding another operating cost to the shrimp industry could put many shrimp fishermen out of business.
>
> * * * * *

> According to the DEIS, Gulf of Mexico shrimp dealers are specialized, and more than 80 percent of their total seafood purchases are shrimp. In addition, many dealers are actually vessel owners and fishermen who act as their own dealers; therefore, as vessels cease operations, so do dealers. Like dealers, Gulf shrimp processors are also very specialized; shrimp accounts for more than 90 percent of the total value of their processed products. All Gulf of Mexico shrimp processors rely on domestic shrimp production.

42. In 2019, NMFS issued a final rule. Sea Turtle Conservation; Shrimp Trawling Requirements, 84 Fed. Reg. 70,048 (Dec. 20, 2019) ("2019 Final Rule"). The 2019 Final Rule amended the alternative tow-time restriction to require all skimmer trawl vessels 40 feet and longer in length to use TEDs designed to exclude small sea turtles in their nets. Several areas of comment are particularly relevant here.

43. First, in response to comments supporting the status quo and opposing the required use of TEDs designed to exclude small turtles, as well as similar comments suggesting tow times are sufficient to avoid sea turtle bycatch mortality, as evidenced by the growing number of Kemp's ridley nests, NMFS pointed to "Stacy, et al., 2015 [sic] as referenced in the FEIS." 84 Fed. Reg. at 70,050. That publication appears to be Stacy, et al, Report of the Technical Expert Workshop: Developing National Criteria for Assessing Post-Interaction Mortality of Sea Turtles in Trawl, Net, and Pot/Trap Fisheries (NOAA Technical Mem. NMFS-OPR-53 March 2016). Most of the studies summarized by Stacy were available at the time of the 2013 Withdrawal, and many of the studies summarized are for situations factually inapplicable to inshore Gulf Coast shrimping, e.g., decompression sickness. Further, Stacey documented a report of field data in that publication assessing sea turtle post-interaction mortality and finding "the majority of the injuries" were classified as low probability of mortality.

44. Second, in response to multiple technical comments regarding shrimpers' ability to comply, NMFS pointed to its change from the proposed rule to provide that TEDs will not be required on skimmer trawl vessels less than 40 feet in length.

45. Third, in response to comments on economic effects, NMFS acknowledged "the regulation may have significant adverse economic effects on the shrimp industry." 84 Fed. Reg. at 70,050. With respect to downstream impacts to processors, NMFS blithely remarked that "imports compete with and are, therefore, substitutes for domestic product." *Id.* at 70,051.

46. Fourth, in response to comments that "NOAA should have mitigation measures for the loss of shrimp due to TED use," NMFS responded that it would "be scheduling and announcing future TED training workshops to be conducted during the phase-in period." 84 Fed. Reg. at 70,057.

47. Fifth, in response to comments that "a six-month delay in effectiveness is unrealistic given NOAA's own data indicates it would take more than two years to fabricate enough TEDs for vessels to use," NMFS agreed and delayed the effective date until April 1, 2021. 84 Fed. Reg. at 70,055. NMFS further noted that "TED production time was one of the factors considered" in altering the coverage of the rule. *Id.*

48. According to NMFS, "the majority of skimmer vessels operate in Louisiana state Waters," but the studies relied upon by Defendants in applying the 2019 Final Rule to Louisiana in state waters were taken by observers aboard vessels shrimping off the coast, not inland. The most recent study relied upon by Defendants states: "For 2014 coverage, NMFS-approved observers were placed on selected skimmer trawl vessels primarily fishing for brown shrimp off Louisiana, Mississippi and Alabama from May through July

2014." *See* NOAA Technical Memorandum NMFS- SEFSC 666 at 3 and 4. The "observer" studies note sea turtle encounters in the dozens but those studies were not conducted in Louisiana's inshore waters. The most recent study noted the Southeast Fisheries Science Center is currently conducting studies on "using these TEDs in the inshore skimmer trawl fishery in Louisiana and North Carolina" on a voluntary basis, concluding "continued research would provide more accurate estimates of protected species interactions in the skimmer trawl fishery." *See* NOAA Technical Memorandum NMFS-SEFSC 666 at 4.

49. In the 2019 Final Rule, NMFS did not grapple with its prior factual findings that, e.g., "revised capture and mortality estimates indicate that the potential benefits of a TED requirement in the Gulf of Mexico skimmer trawl fisheries are significantly less than previously estimated," "the potentially significant economic ramifications a TED requirement would have on fishermen participating in the inshore skimmer trawl fisheries combined with highly uncertain ecological benefits" indicate "a final rule to require all skimmer trawls, pusher-head trawls, and wing nets . . . in the Gulf of Mexico to use TEDs . . . is not warranted," and "outreach efforts would likely improve compliance."

**The March 2021 Delay Rule**

50. On March 31, 2021, NMFS further delayed the effective date of the 2019 Final Rule, citing safety and travel restrictions due to the COVID-19 pandemic that limited Defendants' ability to complete in-person workshops and training sessions that it typically provided and had promised to members of the industry and the public in a Fishery Bulletin. Sea Turtle Conservation; Shrimp Trawling Requirements, 86 Fed. Reg. 16,676 (Mar. 31, 2021) ("March 2021 Delay Rule"). Notice and comment was not extended for this announcement. NMFS noted the delay would "reduce the likelihood of potential increased

sea turtle deaths caused by widespread use of improperly constructed and/or installed TEDs." *Id.* at 16,677.

**The April 2021 Advanced Notice of Proposed Rulemaking**

51. On April 20, 2021, NMFS published an advance notice of proposed rulemaking to solicit comments on the possibility of modifying the TED-related requirements for skimmer trawl vessels less than 40 feet (12.2 meters) in length operating in the southeast U.S. shrimp fisheries. Potential New Turtle Exclusion Device Requirements for Skimmer Trawl Vessels Less Than 40 Feet (12.2 Meters) in Length, 86 Fed. Reg. 20,475 (Apr. 20, 2021).

52. On May 20, 2021, LDWF submitted a letter to NOAA Fisheries informing the agency that even with the 2021 Delay Rule, "the majority of Louisiana's shrimp skimmer vessels are unable to comply with the [2019 Final Rule], not from lack of effort, but from sheer lack of availability."

53. Significantly, LDWF directed NOAA Fisheries to additional data indicating the absence of sea turtles in Louisiana's inshore waters. LDWF accordingly petitioned that

> Should NOAA insist on some TED requirements in skimmer gear, we officially request that NOAA designate the state waters of Louisiana as an exclusion zone from the current and any proposed TED rules, based upon Louisiana's recent bycatch studies showing virtually no turtle interaction, Louisiana's shrimp fleet's declining effort further reducing probability of turtle interaction, the potential economic harm to Louisiana's shrimp industry, the risk of injury on small vessels and the efficacy of current tow time regulations.

54. Defendants have not yet acknowledged LDWF's informing NOAA Fisheries that shrimpers will be unable to comply with the 2019 Final Rule, LDWF's petition for an exclusion zone, or the data proffered in support.

55. The fall shrimping season for a majority of Louisiana shrimping waters began August 9, 2021. Instead of conducting the rigorous in-person outreach programming and workshops that NMFS promised in the Fisheries Bulletin and again in the March 2021 Delay Rule, Defendants provided only a few opportunities to participate in virtual training sessions. Shrimpers, net shop owners, and enforcement agents went into the season with a new rule, widespread non-compliance, costly compliance, and mass confusion.

56. The inshore waters of Louisiana have not historically been home to sea turtles. LDWF's bycatch study has documented only two interactions with sea turtles in 55 years of studies, and both interactions resulted in the safe return of both sea turtles. Neither one was harmed or died because of the interaction with the skimmers.

57. In light of the rule's devastating effects on the shrimpers and the state, the State of Louisiana filed a complaint in this Court to challenge the final rule in August 2021. *State of Louisiana ex rel. Dep't of Wildlife & Fisheries v. Raimondo*, No. 2:21-cv-01523, Complaint (E.D. La. filed Aug. 11, 2021). That case prevailed on a motion for a preliminary injunction that delayed the implementation of the rule. *State of Louisiana ex rel. Dep't of Wildlife & Fisheries v. Raimondo*, No. 2:21-cv-01523, Order and Reasons Granting Motion for Preliminary Injunction (E.D. La. Sept. 9, 2021). However, this Court ultimately determined that the state itself did not have standing to bring the complaint. *State of Louisiana ex rel. Dep't of Wildlife & Fisheries v. Raimondo*, No. 2:21-cv-01523, Order and Reasons, Denying Motion for Summary Judgment and Granting Motion for Summary Judgment (E.D. La. Nov. 28, 2022). The Fifth Circuit affirmed the ruling on standing. *Louisiana State ex rel. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, No. 22-30799 (5th Cir. 2023). Neither this Court's ruling nor the Fifth Circuit's

denied the standing of the individual shrimpers who are required to comply with this rule nor the Louisiana Shrimp Association that represents them.

**HARM TO PLAINTIFFS**

58. Shrimpers and shrimp boats are emblematic of Louisiana and Louisiana culture. The shrimping industry has a substantial impact on Louisiana's economy. According to WBRZ and The Advocate, Louisiana shrimpers harvested 81,000,000 pounds of shrimp in 2019.

59. As recounted above, Defendants' economic analysis found "the financial conditions for many [shrimping] vessels are and have been poor," with "vessels . . . already operating on small economic margins," "the regulation may have significant adverse economic effects on the shrimp industry," "a high number of the part-time vessels may not continue operating as a result," and processors would be fundamentally and negatively impacted, too.

60. Upon information and belief, minority fishermen represent almost two thirds of Southeast Louisiana's commercial shrimping fleet. The 2019 Final Rule will disproportionately affect those fishermen, further marginalizing them in their difficult quest to earn an already-thin living.

61. Because of supply constraints on TEDs and related equipment, the 2019 Final Rule forced many struggling shrimpers to either disobey the law or sit out the season.

62. For those that are compliant, the TEDs rule wreaks continued harm on their efforts to catch shrimp. First, putting on and taking off the TEDs takes significant time – time that would otherwise be used shrimping to maintain the boats' slim margins. Second, addressing issues that regularly arise with TEDs, such as debris trapped in them, takes

additional time and effort that increases the potential for injuries at sea. Finally, the TEDs themselves lead to a loss of legitimate shrimp catches as they can funnel shrimp out of the net – particularly if debris has gotten stuck in the TED. Shrimpers are losing a meaningful percentage of their catch.

63. The danger to the shrimper is exacerbated on smaller boats – which NMFS seeks to expand the regulation to affect. Small skimmer vessels have very limited back deck. Push trawls, with butterfly like nets on either side, can easily dump catch onto the rear of the vessel. But if required to use TEDs, the TED is a drag trawl from the rear requiring a significant alteration of the rigging. When the TED net is pulled in, the TED metal bar can swing around the rear of the deck creating a dangerous situation for the deck hand or captain trying to unload the catch.

64. The size of the economic impact, the permanent exit of shrimpers and vessels from the industry, and the associated fundamental changes to the shrimping industry, each of which will flow from implementation of the 2019 Final Rule, constitute irreparable harm to Louisiana shrimpers.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Administrative Procedure Act's Arbitrary and Capricious Provision

65. Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs of this Complaint.

66. The 2019 Final Rule is arbitrary and capricious as a whole, requiring vacatur. The Final Rule does not make sense in Louisiana inshore waters and changes the agencies' longstanding positions on skimmers without robustly engaging with previous

findings. Moreover, the Final Rule ignores significant reliance interests. Finally, the Final Rule ignored significant evidence on the administrative record.

67. The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion." 5 U.S.C. §706(2)(A). To meet this standard, "[f]ederal administrative agencies are required to engage in 'reasoned decisionmaking.'" *Texas v. United States*, 2021 WL 723856, at *39. "This necessarily means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *Id.*

68. The unexplained change in position by the NMFS provides evidence for the arbitrary and capricious nature of the Final Rule. While requiring TEDs is not new, but requiring TEDs for skimmers inshore is. TEDs are required for some types of shrimp nets, but skimmer vessels were previously exempt so long as they operated within tow-time restrictions. These restrictions were designed to ensure that anything incidentally caught during the tow time could be safely returned to the water when the nets were periodically emptied.

69. Defendants have long exempted inshore shrimp skimmers from TED requirements based on specific factual findings. Indeed, Defendants have agreed with LDWF's assessment that inshore shrimpers pose no threat to sea turtles because they do not encounter one another. *See* 50 C.F.R. § 227.72 (promulgated to protect turtles off the coast, in offshore waters but chose not to enforce the same regulation inshore, providing an exception).

70. In *State of Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 330–31 (5th Cir. 1988), the Eastern District and later the Fifth Circuit considered 50 C.F.R. §227.72, a TED regulation exempting inshore shrimpers and added by a 1987 Final Rule. Defendants reasonably concluded that when "trawling in inshore waters, the shrimper may limit each towing period to 90 minutes or less as an alternative to using a TED." *Id.* at §227.72(e)(3), (6)(ii) (1987). The inshore shrimpers were not going to encounter sea turtles, but in the very rare instance that they did, the tow-time restrictions both then and now sufficiently protect the at-risk species it sought to protect. This finding was a key element of the Fifth Circuit's holding. It noted that the waters *off of the Gulf Coast* were home to five sea turtle species listed as endangered or threatened under the Endangered Species Act. *Id.* at 325. Importantly, there was no data finding sea turtles in the inshore waters.[1] Therefore, the Court and the parties agreed, regulating the inshore shrimpers was not supported by the data. *Id.* Because the data did not support new TEDs inshore, Defendants did not require TEDs inshore. *Id.*

71. In the 1987 Final Rule, NMFS admitted it had "no observer data," but hypothesized that "sea turtles do occur in inshore waters and NMFS believes that they are incidentally caught and drowned in shrimp trawls in inshore waters," and further hypothesized that "[i]t is very likely a significant number of sea turtles are caught and drowned in nets fished in these waters." 52 Fed. Reg. at 24,249. NMFS went on to note that "NMFS scientists have demonstrated that there is a relationship between tow time and percent mortality of sea turtles caught in shrimp trawls," *id.*, but Defendants did not err

[1] *See* Data of Shrimping Activities in inshore waters and capture of turtles: A.R. Final Supplement to the Final Environmental Impact Statement A.R. Vol. 4 E–1, p. 40 and Sea Turtle Conservation; Shrimp Trawling Requirements; Final Rule, 52 Fed. Reg. 24246 (1987).

toward implementing TEDs by assuming factual support. Rather, NMFS stated it was "aware of the limited scientific data on the incidental mortality of sea turtles and TED effectiveness in certain areas, particularly inshore waters . . . Because of this disparity, NMFS agrees that it is not appropriate at this time to require TEDs to be used in both inshore and offshore waters by all shrimp trawlers." 52 Fed.Reg. at 24,246. While that announcement was cabined, the same is true today.

72. The 2019 Final Rule does not engage with NMFS's specific findings in the 1987 Final Rule. This is the very essence of arbitrary and capricious action. The APA prohibits Defendants from "whistl[ing] past [this] factual graveyard" in order to "evade[]" agency's "established pattern of agency conduct and formalized positions." *Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923-27 (D.C. Cir. 2017); s*ee also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (APA requirements ensure that an agency's "prior policies and standards are being deliberately changed, not casually ignored").

73. Defendants also ignore their specific factual findings in the abandoned 2013 TEDs rulemaking process. There, Defendants considered adopting substantively the same regulation as the one promulgated in the 2019 Final Rule, but declined to do so based on specific factual findings:

> We (NMFS) have determined that a final rule to withdraw the alternative tow time restriction and require all skimmer trawls, pusher-head trawls, and wing nets (butterfly trawls) rigged for fishing to use turtle excluder devices (TEDs) in their nets is not warranted at this time. Thus, we are discontinuing our Environmental Review process under the National Environmental Policy Act (NEPA) and do not intend to prepare a Final Environmental Impact Statement for this Action. We therefore withdraw our proposed rule to require TEDs in these vessels published May 10, 2012, in the Federal Register.

* * * * *

> In contrast to the estimates included in the DEIS, the revised capture and mortality estimates indicate that the potential benefits of a TED requirement in the Gulf of Mexico skimmer trawl fisheries are significantly less than previously estimated in the DEIS. Therefore, given the potentially significant economic ramifications a TED requirement would have on fishermen participating in the inshore skimmer trawl fisheries combined with highly uncertain ecological benefits to sea turtle populations compared to the status quo based on the new observer data, we concluded a final rule to require all skimmer trawls, pusher-head trawls, and wing nets (butterfly trawls) in the Gulf of Mexico to use TEDs in their nets is not warranted at this time, and are withdrawing our proposed rule.

78 Fed. Reg. at 9,025-26.

74. Defendants also ignored their 2014 opinion that allowing shrimp fisheries to continue as permitted under the existing regulations was not likely to jeopardize the continued existence of any of listed species.

75. In the 2019 Final Rule, Defendants do not grapple with these specific factual findings. The supporting 2019 EIS similarly "whistles past the graveyard" by discussing only the 2013 and 1987 scientific/fact findings in passing. Agencies, however, are required to frankly "engage[] with all of" its prior "inconsistent statements," and provide good reasons for departure. Defendants not only fail to do so—they fail to even try. *Cf. Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 187 (D.D.C. 2012), *as amended* (Jan. 2, 2013), *aff'd sub nom*. 720 F.3d 370 (D.C. Cir. 2013) ("[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir.1970))). This failure to engage with its prior factual findings on inshore/outshore and extension to skimmers is an independently sufficient reason to set aside or vacate the rule itself. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency required to "provide a more detailed justification

than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy"); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (agency's "prior judgment" or factual finding cannot be ignored "without any consideration whatsoever" of the prior finding or alternative).

76. In the 2019 Final Rule, Defendants responded to a comment that "[s]ea turtles are not observed (i.e., do not occur) in areas where many skimmer trawls operate" by stating that "[a]t this time, we do not have sufficient information to confidently identify areas where sea turtle interactions would not occur, and where we could exempt TED use based on the possible absence of sea turtles." 84 Fed. Reg. at 70,050. "Therefore, at this time, TED exemptions by discrete area are not considered necessary and advisable," i.e., when asked about potentially excluding certain inland waters of Louisiana that do not have sea turtles, Defendants failed to provide support for its one-size-fits-all rule. Indeed, Defendants reversed course from the 1987 Final Rule and relied on an absence of positive data as support for applying the rule to inshore Louisiana waters.

77. Defendants further stated without citation that "fisheries observer data from skimmer trawl vessels demonstrate that sea turtles occur within areas defined as inside [inshore] waters" and claim "sea turtle habitat preferences" as reasons for including Louisiana inshore waters. See 84 Fed. Reg. at 70,057. In fact, Defendants admit to only testing waters "off Louisiana." *Id.* at 70,053.

78. It is black-letter law that such declaratory statements are not sufficient to survive arbitrary and capricious review. *See, e.g., Music Choice*, 970 F.3d at 429 ("[A]n agency's ipse dixit cannot substitute for reasoned decisionmaking."); *Intercollegiate*

*Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 767 (D.C. Cir. 2009) ("[R]ational decisionmaking . . . requires more than an absence of contrary evidence; it requires substantial evidence to support a decision.").

**Reliance Interests**

79. An agency's failure to consider significant reliance interests is an independent ground for setting aside or vacating a regulation. Although Defendants give passing reference to industry and the State's comments in the 2019 Final Rule, they nowhere provide substantive reasons for expanding the TEDs requirements.

80. Defendants failed to consider whether "there was 'legitimate reliance' on the" decades long consistent exclusion of skimmers and inshore shrimpers from TED regulations. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). That was arbitrary and capricious; when, as here, "an agency changes course … it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

81. The 2019 Final Rule ignores the crippling impact the rule will have on the industry, which has structured its entire practice on the prior regime. In May 2021, LDWF asked for the inshore waters of Louisiana to be labeled an exclusion zone in light of evidence provided by LDWF's Bycatch study. Defendants ignored that request.

82. In particular, LDWF submitted its regularly conducted bycatch studies with the exact data Defendants previously stated they lacked. LDWF's studies showed that

requiring TEDs inshore for skimmers is unnecessary as turtles do not interact with inshore skimmers in Louisiana.

83. Defendants nevertheless ignored LDWF's request for an exclusion zone along with the evidentiary support justifying an exclusion. Not only did the data support an exclusion, the data also further rebutted Defendants' decision to include inshore Louisiana waters.

84. Defendants' glaring lack of data in support of the Rule and their failure to consider the data submitted by the Department renders the rule arbitrary and capricious. Defendants entirely failed to consider an important aspect of the problem when they applied the rule to a region without sea turtles. Defendants also offered an explanation for the final decision that runs counter to the evidence before the agency.

85. The data is clear. Louisiana inshore shrimp trawlers do not encounter sea turtles. The Department maintains a Marine Fisheries Section's shrimp trawl database that dates back to 1965 for some areas in Louisiana. The program has been modified over the years to reflect changes in habitat, management, and gears. Since the inception of the program in 1965, 55 years and 128,781 trawl samples later, there have only been two occasions where sea turtle interactions have been recorded in the data management system.

86. The two interactions both involved Kemp's ridley sea turtles. The first was caught in Coastal Study Area 6 (Vermilion/Teche Basin) on 6/7/2011 in a 16 ft. trawl sample at the Vermilion River Cut Off site (Station 1014: Latitude 29.72639, Longitude -92.10889). The second was recorded in a Coastal Study Area 7 16 ft. trawl sample at the Grand Bayou site (Station 1018: Latitude 29.86194, Longitude -93.24222) on 6/5/2012. Both sea turtles were caught and released alive. There is nearly no evidence of interaction,

and no evidence whatsoever of harm, that the NMFS can point to in requiring their rule change.

**SECOND CAUSE OF ACTION**
**Violation of Plaintiffs' Rights under the**
**Commerce Clause and Major Questions Doctrine**

87. Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs of this Complaint.

88. There is record evidence that the 2019 Final Rule will regulate skimmers who are not engaged in interstate commerce or commerce at all. *See* LDWF Comment at 2 ("[N]on-commercial skimmer trawl vessels harvest shrimp recreationally for their own and their families' consumption; these vessels likely would also cease operating."). Such a regulation is dubious under the Commerce Clause of the United States Constitution. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 552-557 (2012); *United States v. Morrison*, 529 U.S. 598, 608 (2000) ("[E]ven under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds.").

89. Given the questions the 2019 Final Rule raises under the Commerce Clause, Defendants must cite to specific authority authorizing them to promulgate this regulation. When, as here, agencies push against constitutional boundaries, they must be given clear authority from Congress. If Congress wishes to authorize Defendants to test the limits of their power under the Commerce Clause and Tenth Amendment, it was required to do so clearly and unambiguously. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001) ("Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose

clearly, it will not be deemed to have significantly changed the federal-state balance."); *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1067 (5th Cir. 1984) ("Absent a clear statement of intention from Congress, there is a presumption against a statutory construction that would significantly affect the federal-state balance.").

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment against Defendants and provide Plaintiffs with the following relief:

(A) A declaratory judgment holding that the 2019 Final Rule violates the APA;

(B) An order restraining and permanently enjoining Defendants from enforcing the 2019 Final Rule;

(C) An order vacating and setting aside the 2019 Final Rule;

(D) Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(E) All other further relief to which Plaintiffs may be entitled.

Respectfully submitted this 17th day of January 2024.

/s/ James Baehr
James Baehr (LSBA 35431)
Sarah Harbison (LSBA 31948)
PELICAN CENTER FOR JUSTICE
PELICAN INSTITUTE FOR PUBLIC POLICY
400 Poydras Street, Suite 900
New Orleans, LA 70130
Telephone: (504) 475-8407
james@pelicaninstitute.org
sarah@pelicaninstitute.org
Attorneys for Plaintiff