# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LOUISIANA SHRIMP ASSOCIATION, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 24-0156** |
| **JOSEPH R. BIDEN, JR., ET AL.** | **SECTION "H"** |

## ORDER AND REASONS

Before the Court are Cross-Motions for Summary Judgment (Rec. Docs. 30, 31). For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED** (Rec. Doc. 31). Plaintiffs' Motion for Summary Judgment is **DENIED.**

## BACKGROUND

Plaintiffs Louisiana Shrimp Association ("LSA"), John Brown, Larry L. Helmer, and Penny Zar bring this action for declaratory judgment and injunctive relief based on Administrative Procedure Act ("APA") claims arising out of the National Marine Fisheries Service ("NMFS")'s 2019 regulation requiring Turtle Excluder Devices ("TEDs") on skimmer trawl vessels of a certain size operating in inshore waters, 84 Fed. Reg. 70,048 (Dec. 20, 2019) (the "Final Rule"). Defendants are NMFS; Donald J. Trump, in his official

1

capacity as President of the United States; and Gina Raimondo, in her official capacity as United States Secretary of Commerce.[1]

## 1.    Statutory and Regulatory Framework

The Endangered Species Act ("ESA") was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ."[2] To accomplish this goal, Congress directed the Secretary of the Interior and the Secretary of Commerce to list endangered and threatened species and designate their critical habitat.[3] An endangered species is one that is in danger of extinction throughout all or a significant portion of its range,[4] and a threatened species is one that is likely to become endangered within the foreseeable future throughout all or a significant portion of its range.[5] Once a species is listed as endangered or threatened, a number of provisions of the statute help ensure the survival and recovery of the species.[6]  One way the ESA protects covered species is by making it unlawful to "take" those species.[7] The ESA defines the term "take" as "to harass, harm, pursue, hunt, shoot,

---

[1] President Donald J. Trump was automatically substituted as Defendant in place of former President Joseph R. Biden. FED. R. CIV. P. 25(d).

[2] 16 U.S.C. § 1531(b).

[3] *See id.* § 1533.

[4] *Id.* § 1532(6).

[5] *Id.* § 1532(20).

[6] *See, e.g., id.* § 1533(f); § 1536.

[7] *Id.* § 1538(a).

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[8]

"Federal agencies may 'promulgate such regulations as may be appropriate' to protect against the unlawful taking of a protected animal."[9] For protected marine animals, the relevant agency is NMFS.[10] The ESA provides that the Secretary may permit "otherwise prohibited" takings if they are "incidental to . . . an otherwise lawful activity."[11]

Five species of sea turtles occur in U.S. waters (Kemp's ridley, loggerhead, leatherback, green, and hawksbill sea turtles), each of which have been listed by NMFS as either endangered or threatened under the ESA.[12] Incidental takings occur during commercial shrimping when shrimpers cast trawl nets into the sea and accidentally ensnare sea turtles.[13] If the sea turtles cannot escape, they drown.[14] But trawl nets can be fitted with a TED, which

---

[8] *Id.* § 1532(19). "The Secretary of Commerce, who is responsible for most marine species, including sea turtles in the ocean, has delegated her responsibility to NMFS." Rec. Doc. 31-1 at 9 n.1. NMFS has the discretion to extend those prohibitions to threatened species or to issue other regulations to protect threatened species. 16 U.S.C. § 1533(d). The Secretary of Commerce extended the prohibition against takings to threatened sea turtles through 50 C.F.R. § 223.205. Rec. Doc. 31-1 at 10.

[9] Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv., No. 22-5295, 2024 WL 3083338, at *2 (D.C. Cir. June 21, 2024) (quoting 16 U.S.C. § 1540(f)); *see also* 50 C.F.R. § 222.101(a)(1).

[10] *Id.* at *1.

[11] 16 U.S.C. § 1539 (a)(1)(B). "The Act prohibits captures of endangered sea turtles within the United States, within the U.S. territorial sea, and on the high seas, except as authorized by the Secretary of Commerce or the Secretary of the Interior." 52 Fed. Reg. 24244 (June 27, 1987). "Incidental takes of threatened and endangered sea turtles during shrimp trawling are exempt from the taking prohibition of section 9 of the ESA so long as the conservation measures specified in the sea turtle conservation regulations (50 CFR 223.206; 50 CFR 224.104) are followed." AR009464.

[12] Rec. Doc. 31-1.

[13] AR001734–35.

[14] AR010989; AR012484–85.

are essentially escape hatches for sea turtles captured in nets.[15] TEDs generally consist "of a metal grid installed in a trawl that mechanically separates sea turtles and other large bycatch species, which are then excluded from the net through an escape opening, while the shrimp are retained in the trawl's tail bag."[16]

## 2. Factual and Procedural Background

Since 1987, NMFS has required TEDs to be installed on most, but not all, shrimp trawls in the southeastern U.S. shrimp fisheries.[17] NMFS promulgated a rule in 1987 requiring shrimp trawlers 25 feet or longer operating in offshore waters from North Carolina to Texas to install NMFS-approved TEDs, subject to a few preconditions.[18] The 1987 rule exempted skimmer trawlers and inshore shrimpers from its requirements, so long as the exempted vessels followed tow time exemptions.[19] The United States Court of

---

[15] Rec. Doc. 33 at 5.

[16] Rec. Doc. 30-1 at 7. The regulations define a TED as "a device designed to be installed in a trawl net forward of the cod end for the purpose of excluding sea turtles from the net, as described in 50 C.F.R. [§] 223.207." 50 C.F.R. § 222.102.

[17] "Shrimp trawler means any vessel that is equipped with one or more trawl nets and that is capable of, or used for, fishing for shrimp, or whose on-board or landed catch of shrimp is more than 1 percent, by weight, of all fish comprising its on-board or landed catch." 50 C.F.R. § 222.102.

[18] 52 Fed. Reg. 24244 (June 29, 1987).

[19] *Id.* at 24246. The 1987 proposed rule defined "inshore" as "marine or tidal waters landward of the baseline from which the territorial sea of the United States is measured." Rec. Doc. 30-1 at 7 (citing 52 Fed. Reg. 6179 (Mar. 2, 1987). The United States Court of Appeals for the D.C. Circuit has explained that the "Fisheries Service regulations have never required every shrimper to use a [TED]. Before 2019, deep-water shrimpers using 'otter trawls' were required to install [TEDs], but shallower-water shrimpers using 'skimmer trawls,' 'pusher-head trawls,' and 'butterfly trawls' were not." *Ctr. for Biological Diversity*, 2024 WL 3083338, at *3 (internal quotations omitted). Deep-water shrimpers operate "out of large, commercial vessels in deeper waters offshore; these vessels predominantly fish using nets called otter trawls, which use boards to hold the net open as it is pulled through the water." *Id.* at *4 n.2 (internal quotations omitted). Other shrimpers sail closer to shore, and

Appeals for the Fifth Circuit upheld this rule in the 1988 decision *Louisiana, ex rel. Guste v. Verity*.[20] In 2012, NMFS proposed a more restrictive rule requiring TEDs for certain additional trawl types, including skimmer trawls,[21] but withdrew it in 2013.[22] In 2016, the agency proposed another rule to require TEDs on almost all vessels in the southeastern U.S. shrimp fisheries.[23] The 2016 proposal considered seven regulatory options ranging from preserving the status quo; to requiring additional shrimpers to use turtle excluder devices based on vessel length, type of trawl used, and fishing location; to requiring all shrimpers to use TEDs.[24]

On December 20, 2019, NMFS promulgated the Final Rule at issue, which requires TEDs on skimmer trawlers greater than 40 feet in length, including those operating inshore. The Final Rule's Environmental Impact Statement ("EIS") estimates that for the 1,047 vessels in the Gulf of Mexico that are expected to be affected,

> the aggregate loss in gross revenue from shrimp loss is about $2.3 million, which represents about 2.9% of their gross revenue. Including the costs of purchasing TEDs, which are slightly less than $1.4 million, the total adverse effect in the first year is almost

---

many of them use skimmer trawls. Pusher-head trawls and wing nets (butterfly trawls) are fished similarly to skimmer trawls; however, these gear types are rare in Southeastern U.S. shrimp fisheries. AR009414. "A skimmer trawl consists of a net attached to a rigid frame on each side of the vessel that is pushed through the water column, typically at night." *Id.* "Once the frames and nets are lowered into the water, only the cod ends are retrieved to remove the catch, while the mouths of the simmer trawls continuously fish." *Id.*

[20] 853 F.2d 322 (5th Cir. 1988).

[21] 77 Fed. Reg. 27411 (May 10, 2012).

[22] 78 Fed. Reg. 9024 (Feb. 7, 2013).

[23] 81 Fed. Reg. 91097 (Dec. 16, 2016).

[24] AR001676–79.

5

$3.7 million, which represents about 4.5% of their gross revenue in the aggregate.[25]

The original effective date of the Final Rule was April 1, 2021. On March 31, 2021, the NMFS delayed the Rule, postponing the effective date until August 1, 2021 in light of the effects of the COVID-19 pandemic on travel and the ability of NMFS to hold in-person TED training sessions.[26] On April 20, 2021, NMFS published an advance notice of proposed rulemaking ("ANPR") to solicit comments on further modification of the TED requirements for skimmer trawl vessels shorter than 40 feet operating in the southeast U.S. shrimp fisheries.[27] NMFS has not yet published a proposed rule or taken further regulatory action regarding the ANPR.[28]

On January 17, 2024, Plaintiffs filed this instant action requesting that this Court set aside and/or vacate the Final Rule and issue an injunction against its continued enforcement.[29] In their Complaint, Plaintiffs allege that

---

[25] AR001848–49.
[26] Rec. Doc. 31-1 at 12 (citing 86 Fed. Reg. 16676-01 (Mar. 31, 2021)). The State of Louisiana challenged the Final Rule in 2021. *Louisiana ex rel.* La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin., 559 F. Supp. 3d 543, 545 (E.D. La. 2021). On September 9, 2021, this Court granted Louisiana's motion for a preliminary injunction and briefly delayed the Final Rule in Louisiana inshore waters until February 1, 2022, reasoning that the pandemic delayed the construction and installation of TEDs. *Id.* at 549. On November 28, 2022, this Court dismissed the case on standing grounds; the Fifth Circuit affirmed on June 15, 2023. *Louisiana ex rel.* La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin., No. 21-1523, 2022 WL 17251152, at *3 (E.D. La. Nov. 28, 2022), *aff'd*, 70 F.4th 872, 880 (5th Cir. 2023).
[27] AR012638.
[28] Rec. Doc. 32 at 5.
[29] Rec. Doc. 1.

the Final Rule (1) is arbitrary and capricious and (2) violates Plaintiffs' rights under the Commerce Clause and/or Major Questions Doctrine.[30]

On August 1, 2024, Plaintiffs filed a Motion for Summary Judgment requesting that this Court hold unlawful and vacate the Final Rule.[31] On September 5, 2024, Defendants filed a Cross-Motion for Summary Judgment.[32] On September 12, 2024, the Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network (the "Conservation Groups") filed an Amici Curiae Brief in support of Defendants' Motion.[33]

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[34] "Under Rule 56, a court normally considers whether the record, viewed in the light most favorable to the non-moving party, evinces a genuine dispute of material fact."[35]

Summary judgment is the appropriate mechanism for reviewing the final action of a government agency under the APA.[36] In such a case, a "'motion

---

[30] *Id.*

[31] Rec. Doc. 30. Defendants also filed an Opposition to this Motion. Rec. Doc. 32.

[32] Rec. Docs. 31, 32.

[33] Rec. Doc. 33.

[34] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).

[35] Holy Cross Sch. v. Fed. Emergency Mgmt Agency, 648 F. Supp. 3d 747, 752 (E.D. La. 2023) (Fallon, J.).

[36] Clark v. Dep't of the Army, No. 17-7757, 2019 WL 917597, at *2 (E.D. La. Feb. 25, 2019).

for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review.'"[37]  The court must decide, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review.[38]

## LAW AND ANALYSIS

Plaintiffs first argue that the Final Rule is arbitrary and capricious because the agency: (1) failed to justify revoking the prior tow time exemption, (2) disregarded the reliance interests of Louisiana shrimpers and the costs and benefits of the Final Rule, and (3) failed to demonstrate that there are incidental takings occurring in Louisiana inshore waters. Finally, they argue that the Final Rule violates the Commerce Clause and implicates the Major Questions Doctrine.

### 1. Whether the Final Rule Is Arbitrary and Capricious

A challenge to an agency action such as this one is subject to judicial review on specific grounds set forth in the APA. The APA states, in pertinent part, that

> [t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and

---

[37] *Holy Cross Sch.*, 648 F. Supp. at 752 (quoting Town of Abita Springs v. U.S. Army Corps of Eng'rs, 153 F. Supp. 3d 894, 903 (E.D. La. 2015)).

[38] *See id.*

8

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law[.][39]

The Fifth Circuit has mirrored this language, finding that courts should only overturn rules pursuant to the APA if an agency action "is arbitrary, capricious, and abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole."[40] A rule is arbitrary and capricious "'only where the agency has considered impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise.'"[41] As the Supreme Court has explained, agency decisions will be upheld so long as the "agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"[42] "The scope of this review 'is

---

[39] 5 U.S.C. § 706.

[40] Buffalo Marine Servs., Inc. v. United States, 663 F.3d 750, 753 (5th Cir. 2011) (internal citations omitted).

[41] BCCA Appeal Grp. v. E.P.A., 355 F.3d 817, 824 (5th Cir. 2003) (quoting *State Farm*, 463 U.S. at 43). Additionally, "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)).

[42] FDA v. Wages & White Lion Invs., L.L.C., 604 U.S. ----, 145 S. Ct. 898, 917 (2025) (quoting Motor Vehicles Mfr. Ass'n of United States, Inc. v. State Farm Mut. Auto. Inv. Co., 463 U.S. 29, 43 (1983)); *BCCA Appeal Grp.*, 355 F.3d at 824 (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency."[43]

### a. Whether the "change in position doctrine" renders the Final Rule arbitrary and capricious

Plaintiffs first contend that NMFS previously justified maintaining tow-time requirements by citing to the lack of data on incidental takings of sea turtles and that NMFS cannot now use such a lack of data to "justify the opposite course."[44] Plaintiffs therefore invoke the so-called "change-in-position doctrine."[45]  As the Supreme Court has stated, under the change-in-position doctrine, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider 'serious reliance interests.'"[46]

"The change-in-position doctrine asks two questions. The first is whether an agency changed existing policy."[47] Here, no party disputes that NMFS, in revoking the prior tow time exemption, changed its position. As such, the next question is whether NMFS "display[ed] awareness that it is changing position and offer good reasons for the new policy?"[48]  As to this point, Plaintiffs contend that the agency must "provide a more detailed justification than would suffice

---

[43] *Wages & White Lion Invs.*, 145 S. Ct. at 917 (quoting *State Farm*, 463 U.S. at 43).

[44] Rec. Doc. 30-1 at 22.

[45] *See Wages & White Lion Invs.*, 145 S. Ct. at 917.

[46] *Id.* (internal quotations omitted) (quoting Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221–22 (2016)).

[47] *Id.* at 918.

[48] *Id.* (internal quotations omitted).

10

for a new policy created on a blank slate."[49]  The Supreme Court has stated, however, that the "mere fact that an agency interpretation contradicts a prior agency position is not fatal."[50]  In *F.C.C. v. Fox News Television Stations*, the Court explained that while an agency must "show that there are good reasons for the new policy," it need not always "demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."[51] Sometimes it must, however, such as when "its new policy rests upon factual findings that contradict those which underlay its prior policy," or "when its prior policy has engendered serious reliance interests that must be taken into account."[52]

The upshot is that an agency action is not subject to a heightened or more searching standard of review than that under the APA simply because it represents a change in administrative policy.[53] Thus, NMFS need only provide an adequate justification for the change.

### i. *Whether NMFS adequately justified revoking the prior tow time exemption*

Here, NMFS adequately explained its decision. The November 4, 2019, Final Environmental Impact Statement ("FEIS") estimated that 7,794 sea turtles are captured annually by Gulf of Mexico skimmer trawls, pusher-head

---

[49] Rec. Doc. 30-1 at 17 (quoting *F.C.C. v. Fox News Television Stations*, 556 U.S. 502, 513 (2009)).

[50] Smiley v. Citibank (S. Dakota), N.A., 517 U.S. 735, 742 (1996).

[51] *Fox News Television Stations*, 556 U.S. at 515.

[52] *Id*. The Court further note that "[i]t would be arbitrary or capricious to ignore such matters." *Id.*

[53] *Id.* "[I]t is not that further justification is demanded by the mere fact of policy change." *Id.* at 516. Rather, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.*

11

trawl, and wing net fisheries, resulting in nearly 3,000 total sea turtle mortalities per year.[54] To reach this number, NMFS "calculated sea turtle catch per unit effort rates based on observed effort in the skimmer trawl fisheries," and then estimated sea turtle mortality "based on observed mortality rates and taking into consideration the effects of post-interaction mortality on captured and released sea turtles."[55]

When the 1987 rule was issued regulating certain shrimp trawling vessels, NMFS acknowledged that it had limited scientific data on the incidental mortality of sea turtles and TED effectiveness in certain areas. At the time, skimmer trawls were exempted in part because NMFS assumed that these gear types posed less of a threat to sea turtles because nets would be pulled from the water in a short enough time that turtles would not drown. NMFS therefore stated that it was not appropriate at that time to require TEDs on both inshore and offshore waters by all shrimp trawlers.[56] In *State of Louisiana ex rel. Guste v. Verity*, the Fifth Circuit upheld the 1987 rule based, in part, on that assumption.[57] Since then, however, NMFS gathered new data supporting the Final Rule.

---

[54] AR001796–97.

[55] AR002169.

[56] 52 Fed. Reg. 24244, 24246 (June 29, 1987).

[57] *Guste*, 853 F.2d at 331. Plaintiffs argue that the *Guste* court upheld the rule based on information that "TEDs will not be effective inshore because the TEDs will clog with debris that reportedly lines the bottom of these waters," as well as the lack of data on inshore interactions. Rec. Doc. 30-1 at 8. The Conservation Groups point out that "the Fifth Circuit upheld NMFS's 1987 distinction between TED regulations in offshore waters and inshore waters based on the now-disproven assumption that limiting tow times in inshore waters would prevent turtle mortality." Rec. Doc. 33 at 15 (citing *Guste*, 853 F.2d at 330–331). As such, *Guste* does not foreclose NMFS from modifying TED regulations in the future. Moreover, NMFS responded to comments stating that TEDs may encounter debris in 2016. *See, e.g.*, AR009466.

In 2011, tow time restrictions were applicable to all skimmer trawls. NMFS observed an elevated level of strandings and stated that necropsy results revealed that stranded turtles likely "perished due to forced submergence (drowning), which is commonly associated with fishery interactions."[58] NMFS's data also indicated that none of the stranded turtles showed signs "of external oiling to indicate effects associated with the Deepwater Horizon (DWH) oil spill event."[59]

Concurrent with the 2012 proposed rule, NMFS collected observer data that documented the capture of sea turtles by skimmer trawls. The federal observer data, which was published in 2012, 2013, and 2014, indicated widespread noncompliance with tow time restrictions and documented sea turtle mortality resulting from tows that exceeded those restrictions.[60] As the Conservation Groups point out, difficulties with enforcement  reduce the likelihood of compliance.[61] Most tow time violations go unobserved and unenforced,[62] and even law enforcement observation is unlikely to find violators.[63] NMFS noted that enforcement personnel would need to remain undetected for at least 55 minutes—which is "practically impossible at sea"— or else their very presence may cause skimmer trawls to adhere to tow time

---

[58] AR000266.

[59] *Id.* Plaintiffs contend that because NMFS stated that "stranding coverage has increased considerably due to the [Deepwater Horizon] oil spill event, which has increased the likelihood of observing stranded animals," NMFS "acknowledged that the year-over-year data wasn't comparable at all." Plaintiffs' attempt to cherry-pick statements from NMFS is, at best, misleading.  Indeed, Plaintiffs fail to include NMFS's above-cited statements that the stranded sea turtles likely died due to fishery interactions.

[60] AR010924; AR010893; AR010955.

[61] AR000267; AR009491.

[62] AR009491.

[63] *Id.*

restrictions when they would not otherwise do so.[64] And less compliance means an increased likelihood that turtles will be forcibly submerged and towed, become comatose, and eventually drown.[65]

Further, NMFS assessed the data collected during the observer program in conjunction with scientific studies and concluded that even full compliance with tow times resulted in turtle mortality.[66] NMFS also considered data indicating that post-interaction mortality for the trawl fisheries could be "more than triple the number estimated based on dead and comatose turtles alone."[67] In their response to public comments, NMFS noted that even though many turtles were often released alive during the observer program, studies and expert opinion indicated that the "persistent or delayed effects" of the time that sea turtles spent submerged could lead to "deaths of some turtles that appear to be in good health at the time of release."[68] NMFS therefore concluded that

---

[64] AR000267; AR001671.

[65] AR012113. "Mortality rates increase rapidly when tow times exceed 50 minutes, as they regularly have since the tow time limits were implemented." Rec. Doc. 33 at 20 (citing AR010990).

[66] "Within 30 minutes of being forcibly submerged, a turtle's heart rate sharply declines, blood lactate levels increase, and blood oxygen depletes to very low levels." Rec. Doc. 33 at 20 (citing AR012115; AR010989). "Thus, a sea turtle released alive from a net that complied with the 55- or 75-minute tow time limit may still die from the traumatic physiological effects of capture." *Id.* at 20–21 (citing AR001794). "Moreover, it takes around 20 hours for the blood lactate level in a sea turtle to return to baseline after a trawl encounter." *Id.* at 21 (citing AR010991; AR012484). "This long recovery time indicates that repeatedly captured sea turtles are likely even more susceptible to dying from a subsequent encounter." *Id.* (citing AR012115). "NMFS did not account for these post-interaction mortalities in its 1987 decision to impose tow time limits." *Id.*

[67] AR002052.

[68] AR009466.

"tow time limits may not be as effective in reducing sea turtle bycatch and mortality as previously thought."[69]

In support of that response, NMFS cited a 2017 NMFS Procedural Directive 02-110-21 ("2017 Directive") and a 2016 conference report (the "Stacy Report"), both of which focused on post-interaction mortalities. Plaintiffs argue that these citations were insufficient to justify departing from tow time exemptions.[70] The Court disagrees.

Plaintiffs aver that the Stacy Report relies upon information that was available at the time of the 2013 withdrawal rule and argue that "old data cannot provide new reasons to justify a policy change."[71] But NMFS *did* obtain new data since the 2013 withdrawal rule. In 2015, NMFS held an expert workshop that was centered around post-interaction sea turtle mortality and informed the development of national criteria for assessing such mortality; this workshop resulted in the Stacy Report.[72] The Conservation Groups point out that the report synthesized both historic and more recent studies[73]—including new data collected after the withdrawal of the 2012 rule"[74]—as well as "expert opinions and recommendations regarding post-interaction mortality from the 2015 workshop."[75]

---

[69] *Id.*; AR001796.

[70] Plaintiffs suggest that NMFS failed to adequately respond to public comments as to this issue. "An agency must consider and respond to significant comments received during the period for public comment." Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 96 (2015). The Court finds that NMFS considered the relevant data and adequately responded to public comments.

[71] Rec. Doc. 30-1 at 22.

[72] AR010976.

[73] Rec. Doc. 33 at 23 (citing AR010980–84; AR010989–901).

[74] *Id.* (citing AR011084–89; AR011036; AR011081).

[75] *Id.* (citing AR010980–84; AR011002–13).

15

After the workshop, NMFS issued the 2017 Directive to "provide the process and criteria for assessing post-interaction mortality."[76] Plaintiffs contend that NMFS's citation to the 2017 Directive is misplaced because it states that "sea turtles that are captured in fisheries and subsequently released cannot be directly measured."[77] Plaintiffs argue that NMFS cannot reverse course after acknowledging a "lack of data" when a lack of data previously justified tow time exceptions.

The 2017 Directive, however, did not necessarily admit a lack of data. Rather, it noted that

> [b]ecause the survival or death of sea turtles that are captured in fisheries and subsequently released cannot be directly measured in most instances, *the likelihood of mortality is primarily based on activity level and the presence or absence of any abnormal behavior or injuries*. This information is largely collected by observers on board commercial fishing vessels; observers are trained to document the condition of bycaught sea turtles amid a number of other duties.[78]

The 2017 Directive also cited to and considered studies and information on post-interaction mortality published after the 2013 rule withdrawal.[79] But even without the 2017 Directive or Stacy Report, as explained above, NMFS did collect new data indicating (1) widespread noncompliance with tow times and (2) high collections of sea turtles in inshore waters. Thus, the agency did not "reverse course" absent sufficient data.

---

[76] PROCESS FOR POST-INTERACTION MORTALITY DETERMINATIONS OF SEA TURTLES BYCAUGHT IN TRAWL, NET, AND POT/TRAP FISHERIES, NMFS PROCEDURAL INSTRUCTION 02-110-21 at 2 (Mar. 23, 2017, renewed Mar. 23, 2022).

[77] *Id.* at 4.

[78] *Id.* at 9 (emphasis added).

[79] *Id.* at 9–10.

16

Additionally, the 2013 withdrawal rule indicates that NMFS withdrew the rule largely because the turtles observed in the federal observer program were small enough to pass between the required maximum bar spacing in the grid of the TEDs, which negated much of the conservation benefit estimated from the 2012 proposed rule.[80] The 2016 proposed rule explained that after the 2013 withdrawal rule, NMFS initiated additional TED testing to evaluate "both small sea turtle exclusion and shrimp retention within the skimmer trawl fisheries."[81] NMFS noted that this testing "produced several TED configurations that all use a TED grid with 3-inch (7.6 cm) bar spacing (i.e., less than the current 4-inch bar spacing maximum) and escape-opening flap specifications that would allow small turtles to effectively escape the trawl net, which could be employed by trawl vessels in areas where these small turtles occur."[82]

Based on new information about the difficulty of enforcing tow time restrictions,[83] the lack of effectiveness of tow times in avoiding sea turtle mortality,[84] TED bar spacing,[85] and turtle mortality,[86] NMFS adopted the Final Rule in 2019. In sum, NMFS had sufficient information justifying the Final Rule and made scientific assessments "based upon its evaluation of complex scientific data within its technical expertise."[87]

---

[80] AR00289-90.

[81] AR002168.

[82] *Id.*

[83] *Id.*

[84] AR002169.

[85] AR002168.

[86] AR009466.

[87] *BCCA Appeal Grp.*, 355 F.3d at 824. Additionally, in an Issues Advisory Memorandum, the Regional Administrator for the Department of Commerce stated that

### ii.    Whether NMFS "glossed over prior precedents"

Next, Plaintiffs argue that the Final Rule failed to address the findings in a 2014 Biological Opinion ("2014 BiOp"). The 2014 BiOp addressed the effects of (1) "the continued implementation of the sea turtle regulations applicable to shrimp trawling" at the time and (2) "continued authorization of Southeast U.S. shrimp fisheries in federal waters" on sea turtle populations and their "critical habitat."[88]

Plaintiffs point out that the 2014 BiOp noted that maintaining the status quo was not likely to "jeopardize the continued existence" of sea turtles,[89] citing caselaw explaining that if "'an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.'"[90] Here, however, the BiOp is not a "prior precedent" that NMFS failed to adequately explain.[91]

First, the BiOp was issued under a separate section of the ESA, which directs each federal agency, in consultation with NMFS, to ensure that actions by the agency is not likely to "jeopardize the *continued existence*," or threaten the critical habitat of, an ESA-listed species.[92] The Final Rule was

---

there was information indicating that skimmer trawl vessels have "increased the size and amount of gear over time" and that use of such larger skimmer trawl nets "creates the possibility that a sea turtle could be captured within the mouth of the net and not be visible during a cursory cod inspection, a scenario compounded by the fact that many vessels fish at night." AR009414.

[88] AR011145.

[89] AR00111369–70.

[90] Am. Wild Horse Pres. Campaign v. Perdue, 873 F.3d 914, 928 (D.C. Cir. 2017) (quoting Greater Boston Television Corp. v. F.C.C., 444 F.2d 841, 852 (D.C. Cir. 1970)).

[91] *C.f. id.* (holding that the agency impermissibly "glossed over" prior policy where it failed to "even to acknowledge its past practice and formal policies . . . let alone to explain its reversal of course").

[92] 16 U.S.C. § 1536(a)(2).

promulgated under ESA sections 4(d) and 11(f), which directs NMFS to issue such regulations deemed necessary to provide for the "conservation" of such species, as well as to enforce the ESA.[93] The Final Rule concludes that "the most effective *protective* measure for threatened and endangered sea turtle populations is to reduce the total time sea turtles are entrained in a skimmer trawl by using TEDs."[94]

Put simply, the BiOp's finding that maintaining current regulations would not jeopardize the existence of sea turtles or result in the destruction of their critical habitat does not necessarily conflict with NMFS's decision to issue the Final Rule in order to protect sea turtles, which remain listed as endangered or threatened.[95]

Second, the 2014 BiOp *did* estimate an annual skimmer trawl bycatch mortality of 2,017 sea turtles; as Defendants point out, the number of interactions and captures exceeded this number.[96] The Final Rule estimated a conservation benefit of 1,168 sea turtles.[97] And a recent NMFS biological opinion from 2021 estimated an annual bycatch mortality of 1,364 sea turtles

---

[93] 16 U.S.C. § 1533(d) (emphasis added); *id.* § 1540(f)

[94] 84 Fed. Reg. 70048, 70050 (Dec. 20, 2019) (emphasis added).

[95] Plaintiffs contend that NMFS ignored contrary data indicating an increase in the turtle population in the period before TEDs were required in inshore waters (despite the Deepwater Horizon oil spill). The Court finds this argument without merit. First, as stated above, NMFS considered all relevant data and public comments. Second, such data does not undermine the data on captures or sea turtle mortality. Because sea turtles remain listed as endangered or threatened, NMFS may issue regulations to protect them. And as NMFS noted, "as sea turtle populations increase, interactions between skimmer trawl vessels and sea turtles are expected to likewise increase." AR009466.

[96] AR011324.

[97] 84 Fed. Reg. 70048, 70049.

even after implementation of the Final Rule.[98] If anything, the BiOp lends further support to the Final Rule and indicates that even with implementation of the Final Rule, sea turtles will continue to die as a result of interactions with shrimp trawlers.

### iii. *Whether NMFS failed to consider "serious reliance interests"*

Plaintiffs next argue that the Final Rule was unreasonable because NMFS failed to consider the shrimpers' "substantial reliance" on their long-standing approach to TEDs, and point out that shrimpers, particularly those who trawl part time, will suffer economic consequences. Plaintiffs further argue that NMFS did not adequately consider the Final Rule's costs and benefits. Again, this Court disagrees.

First, it is unclear whether Plaintiffs have established the existence of any justifiable, detrimental reliance on the 1987 rule's tow time exemption for inshore waters. In *Mozilla Corp. v. FCC*, the United States Court of Appeals for the D.C. Circuit held that reliance on an agency's determination was not reasonable in part because the regulation had been subject to legal challenges.[99] In the present case, in the 1987 rule, NMFS stated that it "believes that if a TED effectively excludes turtles in offshore waters, it will function as effectively in inshore waters."[100] NMFS acknowledged, however,

---

[98] Defendants also state that "sea turtle mortality caused by skimmer trawl vessels represents only a portion of sea turtle mortality caused by all gears combined" and that "[n]on-lethal interactions are higher still." Rec. Doc. 38 at 9. They contend that "even with the use of TEDs by vessels 40 feet and greater in length, skimmer trawls will continue to kill a significant number of sea turtles." *Id.*

[99] 940 F.3d 1, 64 (D.C. Cir. 2019) (per curiam).

[100] 52 Fed. Reg. 24244, 24246 (June 29, 1987).

that "TEDs have not been tested for turtle exclusion in inshore waters," and that "[t]he final regulations do not require shrimpers to use TEDs in inshore waters at this time."[101] NMFS has continued to develop and test TEDs and has periodically issued proposed new versions of the 1987 rule. Given this uncertain regulatory environment, Plaintiffs have not established that their purported reliance interests are reasonable.

But even if those interests were reasonable, NMFS adequately considered them. Where a "prior policy has engendered serious reliance interests," an agency must only provide a reasoned explanation for its change in policy.[102] The record confirms that NMFS considered public comments on the potential costs and benefits of TEDs and modified the minimum vessel length covered by the requirement from 26 feet (in the proposed rule) to 40 feet in response.[103] NMFS also considered comments addressing, among other things, the additional benefits of TEDs (such as the fact that they clear additional debris and bycatch),[104] the economic benefits of sea turtles in coastal communities,[105] as well as comments from shrimpers who supported their implementation.[106]

Further, in 2022, the Center for Biological Diversity and other conservation groups sued NMFS in the U.S. District Court for the District of Columbia on the basis that the Final Rule was not protective enough of

---

[101] *Id.*
[102] *Wages & White Lion*, 145 S. Ct. at 918.
[103] AR009472.
[104] *See, e.g.*, AR002213–002229.
[105] *See, e.g.*, AR003010; 008614.
[106] *See, e.g.*, AR002196.

imperiled sea turtles.[107] They argued that the Final Rule should have covered at least as many shrimpers as the 2016 proposed Rule and requested that the rule be remanded without vacatur.[108] The district court upheld the TED Rule, finding in part that the rule was "an appropriate way to protect sea turtles, while limiting the incidental effects on the shrimping industry."[109] The United States Court of Appeals for the D.C. Circuit affirmed, holding that the TED Rule "reflects a policy choice, which was adequately explained by [NMFS's] consideration of the *rule's costs and benefits*."[110]

Plaintiffs argue that Defendants' reliance on the D.C. Circuit's decision is misplaced because that decision preceded the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*. In *Loper*, the Supreme Court overruled its prior decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.*,[111] holding that in deciding whether an agency has acted within its statutory authority, courts may not defer to the agency's interpretation of the law simply because the statute is ambiguous; rather, courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority."[112]

In the present case, *Loper Bright* does not apply because the Court is not required to interpret an ambiguous statutory term. Again, NMFS is authorized

---

[107] Ctr. for Biological Diversity v. NMFS, 628 F. Supp. 3d 189 (D.C. Cir. 2022), *aff'd*, No. 22-5295, 2024 WL 3083338 (D.C. Cir. June 21, 2024).

[108] *Id.*

[109] *Id.* at 214.

[110] *Ctr. for Biological Diversity*, 2024 WL 3083338, at *3 (emphasis added).

[111] 467 U.S. 837 (1984), *overruled by* Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024).

[112] *Loper*, 603 U.S. at 398–99.

to regulate the incidental "taking" of sea turtles, and a "take" is clearly defined.[113] That is why Plaintiffs do not challenge NMFS's definition in their Complaint.[114] And the D.C. Circuit court, in holding that the Final Rule was not arbitrary and capricious, did not rely on "*Chevron* deference"—because it was irrelevant to the case before them. The same is true here. After reviewing the record, the Court agrees with the D.C. Circuit court that NMFS properly considered the costs and benefits of the Final Rule, including any purported "reliance interests."[115]

Plaintiffs argue that NMFS failed to consider contrary data presented in a May 2021 comment letter from the Louisiana Department of Wildlife & Fisheries ("LDWF") ("2021 Comment Letter"), which references a state-conducted bycatch monitoring program and database.[116] Plaintiffs aver that this data indicated that sea turtles rarely encounter trawlers and that NMFS therefore failed to justify the Final Rule's costs.

First, the 2021 Comment Letter and database relied on by Plaintiffs are not in the administrative record and should not be considered by this Court.[117] Second, the 2021 Comment Letter post-dates the Final Rule, so it was not available at the time of NMFS's decision. Third, even assuming this Court

---

[113] Again, "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

[114] Rather, Plaintiffs challenge the Final Rule substantively and argue that NMFS has no authority to extend regulations to inshore trawlers. In their Opposition, however, Plaintiffs confusingly suggest that NMFS's definition is overly broad. Rec. Doc. 36 at 20. For the same reasons, the Court rejects that argument.

[115] *See, e.g.*, AR001654 (2019 EIS Abstract).

[116] Plaintiffs also rely upon an extra-record affidavit regarding LDWF's shrimp trawl database.

[117] *Guste*, 853 F.2d at 334 n.8 (citing Camp v. Pitts, 411 U.S. 138, 142–43 (1973)).

23

could consider it, the data referenced in the 2021 Comment Letter is irrelevant because it concerns smaller vessels that are not impacted by the Final Rule. Fourth, even assuming the data were relevant, LDWF's statement that bycatch data suggests little to no turtle interactions directly contradicts data that NMFS (1) collected and/or assessed prior to the Final Rule and (2) subsequently considered prior to promulgating the Final Rule.[118]

As Plaintiffs acknowledge, agencies have the discretion to choose between studies.[119] Although Plaintiffs correctly note that an agency does not have "free rein to use inaccurate data," the state's data indicating a lower number of captures does not, as Plaintiffs suggest, indicate that the federal observer program data is overly inflated or otherwise unreliable.[120] If anything, as the Conservation Groups point out, the federal observer program data would *underestimate* the number of captures. Logically, "[b]ecause only a tiny percent of skimmer trawl fishing is observed, the actual number of sea turtles captured by the skimmer trawl fishery in Louisiana is exponentially greater than the number of observed captures."[121]

Finally, to the extent that Plaintiffs argue that NMFS did not consider the costs as outlined in comments from the LSA, as well as comments from

---

[118] *See, e.g.*, AR010893, AR10924, AR010955.

[119] *See* Dist. Hosp. Partners v. Burwell, 786 F.3d 46, 56 (D.C. Cir. 2015).

[120] Plaintiffs contend that "LDWF pointed out that Defendants' calculations likely overstated both numbers because they extrapolated deep-water skimmer-trawl data into shallow water shrimping." Rec. Doc. 30-1 at 14.

[121] Rec. Doc. 33 at 14. "For example, observer coverage in the skimmer trawl fishery from 2012 to 2015 amounted to only about 0.5% of the hours that the fishery spent fishing in a similar five-year period." *Id.* (citing AR001796 and AR001808).

Mississippi officials and the LDWF, the Court rejects that argument.[122] Nothing in the record suggests that NMFS ignored the costs and benefits or otherwise ignored "contrary data."

In *Guste*, the Fifth Circuit stated that "[a]lthough we do not denigrate appellants' concern with the expense and inconvenience the regulations will visit on Louisiana's shrimping industry, Congress has decided that these losses cannot compare to the 'incalculable' value of genetic heritage embodied in any protected living species."[123] Here, NMFS properly considered the costs and benefits of the Final Rule and determined in its discretion that the benefits of species conservation justified the costs of TEDs.

### b. Whether NMFS failed to demonstrate that there are incidental takings occurring in Louisiana inshore waters

Plaintiffs also contend that inshore shrimpers do not pose a threat to sea turtles because they do not encounter one another and argue that NMFS failed to establish incidental takings were occurring in Louisiana inshore waters. Evidence in the record, however, belies Plaintiffs' contention.

In the Final Rule, NMFS stated that it "conducted extensive fishery-independent and fishery-dependent testing during the 2013, 2014, 2015, and

---

[122] AR003168 (LDWF); AR008616 (LSA); AR008608 (Mississippi officials). None of the comments provided "new data" but rather argued that (1) the costs of TED implementation were too high, (2) estimations as to turtle mortality were overinflated, and/or (3) TEDs were ineffective. NMFS clearly considered (by modifying the 2016 proposed rule), and/or appropriately rejected (based on a valid interpretation of the most current data), those arguments. Additionally, NMFS considered a range of management alternatives. AR001675-81.

[123] *Guste*, 853 F.2d at 331.

2016 fishing seasons using a variety of TED configurations and under a variety of fishery conditions off Louisiana, Mississippi, Alabama, and North Carolina."[124] NMFS also stated that "[f]isheries observer data from skimmer trawl vessels demonstrate that sea turtles occur within areas defined as inside waters by the Louisiana Statutes" and that "[t]he inside/outside waters definition also does not correlate with bathymetric or other sea turtle habitat preferences in a manner that lends itself to practical consideration."[125]

Plaintiffs contend that there is no data supporting NMFS's statements. Their argument is, at best, disingenuous. As the Conservation Groups point out, sea turtles are highly migratory and travel thousands of miles between the habitats where they are born, forage, and reproduce.[126] Females come ashore to lay eggs on sandy beaches along the Gulf coast, often the same beaches where they were born.[127] Most sea turtle species also return to their same foraging areas in the Gulf year after year.[128] Skimmer trawls more than 26 feet in length fish in water approximately 8 feet and deeper where sea turtles, especially Kemp's ridleys (the most critically endangered of the above-mentioned sea turtles species),[129] tend to forage.[130] In 2012, observer data for the Gulf of Mexico skimmer trawl fishery documented that the highest concentration of sea turtle captures occurred in southeastern Louisiana's

---

[124] AR009470.

[125] AR009473.

[126] *See, e.g.*, AR001698; AR001724–25.

[127] *See, e.g.*, AR001700; AR001706

[128] *See, e.g.* AR001701.

[129] AR001712.

[130] AR001658; AR001803.

inshore waters.[131] In 2013, all sea turtle captures documented by observers occurred in Louisiana inshore waters.[132] Notably, Plaintiffs frequently cite to the Fifth Circuit's decision in *Guste*, but fail to acknowledge the court's finding that the "administrative record amply demonstrates that sea turtles are found in inshore waters" and that "[s]ea turtles not only frequent inshore waters; the record is replete with evidence to show that they are captured there as well."[133] Thus, contrary to Plaintiffs' assertion, observer data confirms that sea turtles are captured in Louisiana's inshore waters.

As the Court of Appeals for the D.C. Circuit has explained, "agencies may change their minds in the course of a rulemaking, even though those affected may be disappointed."[134] Here, NMFS's decision to revoke the prior tow time exemption via implementing the Final Rule may constitute a change in policy with which Plaintiffs disagree, but that change was not arbitrary and capricious.

### 2. Whether the Final Rule Violates the Commerce Clause and Major Questions Doctrine

Next, Plaintiffs argue that the Final Rule violates the Commerce Clause because it will impact skimmers who are not engaged in interstate commerce. Defendants respond that Plaintiffs do not have standing and that even assuming Plaintiffs had standing, under the Supreme Court's decision in

---

[131] AR010924. "Between 2010 and 2019, the majority of all sea turtle captures documented in Alabama, Mississippi, and Louisiana inshore waters occurred in Louisiana." Rec. Doc. 33 at 14. "Of the sea turtles caught over the past decade, a majority have been Kemp's ridleys, increasing the mortality pressure on this critically endangered species." *Id.*

[132] AR010907.

[133] *Id.* at 329.

[134] PSWF Corp. v. FCC, 108 F.3d 354, 357 (D.C. Cir. 1997).

*United States v. Lopez*, Defendants need set forth only a "rational basis" for the conclusion "that a regulated activity sufficiently affected interstate commerce," which they have done.[135]

The Court agrees that Plaintiffs have not satisfied their burden of showing standing. A plaintiff "bears the burden of showing that he has standing for each type of relief sought."[136] To satisfy the standing requirements of Article III of the Constitution, a plaintiff must establish an injury that is (i) "concrete, particularized, and actual or imminent"; (ii) "fairly traceable to the challenged action"; and (iii) "redressable by a favorable ruling."[137] Moreover, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."[138] "To survive a summary judgment motion," Plaintiffs "must set forth by affidavit or other evidence specific facts to support their claim."[139]

Here, Plaintiffs contend that the Final Rule impacts noncommercial skimmer trawl operations that engage in shrimping for personal and family consumption, which they contend are activities that are purely intrastate. Plaintiffs attach an affidavit from Acy Cooper, president of the LSA, who states that the LSA's membership "consists of individuals who shrimp for commercial purposes as well as those who engage in shrimping for personal and family consumption."[140] Cooper does not, however, explicitly state that he or any

---

[135] 514 U.S. 549 (1995).
[136] Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).
[137] Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal quotations marks and citations omitted).
[138] Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).
[139] Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).
[140] Rec. Doc. 36-1 at 3.

specific member[141] engages in purely noncommercial shrimp fishing using boats large enough to be subject to the new TED requirements. As Defendants point out, the TED Rule does not affect recreational fishers because, under Louisiana law, all skimmer trawls 40 feet and greater engage in commercial fishing.[142] Plaintiffs therefore likely fail to demonstrate standing.

Plaintiffs counter that "this classification is a matter of federal regulation, not an inherent characteristic of the activity itself."[143] But even considering this argument (and accepting that Plaintiffs have established standing), the Final Rule does not run afoul the Commerce Clause.

Under the Commerce Clause, Congress may "regulate Commerce . . . among the several States."[144] The Supreme Court has consistently stated that the Commerce Clause permits congressional regulation of three categories: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) activities that

---

[141] Plaintiffs also argue that the members of the LSA have demonstrated associational standing.

[142] "[S]kimmer trawls are not an authorized gear for recreational fishers" and "[a]ny fishers using skimmer trawl gear would, therefore, be considered a commercial fisherman, even if using the gear only to harvest for personal consumption." Rec. Doc. 32-1 (quoting AR009437).

[143] Defendants, however, note that NMFS does not issue permits for either commercial or recreational vessels to shrimp in state waters. 50 C.F.R. § 622.50(a) ("For a person aboard a vessel to fish for shrimp in the Gulf [exclusive economic zone ("EEZ")] or possess shrimp in or from the Gulf EEZ, a commercial vessel permit for Gulf shrimp must have been issued to the vessel and must be on board."). Rather, that is left to the state. Rec. Doc. 38 at 6 (citing 2024 LOUISIANA RECREATIONAL FISHING REGULATIONS, *available at* https://www.wlf.louisiana.gov/assets/Resources/Publications/Regulations/2024-LDWF-Fishing-Regulations.pdf).

[144] U.S. CONST. art. I, § 8, cl. 3.

29

'substantially affect' interstate commerce."[145] In *Gonzalez v. Raich*, Justice Scalia explained that, as to the third category, "Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce."[146]

In assessing the scope of Congress' authority under the Commerce Clause, a court assesses whether a "rational basis" exists for the conclusion that a regulated activity substantially affects interstate commerce.[147] In *GDF v. Realty Investments Ltd. v. Norton*, the Fifth Circuit found that the application of the ESA's "taking" prohibition to land containing six regulated species which were found only in Texas did not exceed Congress' authority under the Commerce Clause.[148] The court found that although the proposed takings at issue did not themselves substantially affect interstate commerce, takings of endangered species, when viewed in the aggregate, did.[149] The court reasoned that the "ESA's protection of endangered species is economic in nature," that the "ESA's drafters were concerned by the 'incalculable' value of the genetic heritage that might be lost absent regulation," and observed that the majority of takes of species "result from economic activity."[150]

Plaintiffs contend that specific instances of noncommercial shrimping are not interstate commerce; however, "where a *general regulatory statute bears a substantial relation to commerce*, the *de minimis* character of

---

[145] Gonzalez v. Raich, 545 U.S. 1, 33–34 (2005) (Scalia, J., concurring) (quoting Perez v. United States, 402 U.S. 146 (1971)).

[146] *Id.* at 37.

[147] *Raich*, 545 U.S. at 22.

[148] 326 F.3d 622 (2003).

[149] *Id.* at 640.

[150] *Id.* at 639.

individual instances arising under that statute is of no consequence."[151] Here, the NMFS promulgated the Final Rule pursuant to explicit authority under the ESA. And Plaintiffs do not challenge the constitutionality of the ESA itself. As such, the Final Rule does not violate the Commerce Clause.[152]

Finally, for this same reason, Plaintiffs are incorrect that the Major Questions doctrine renders the Final Rule unconstitutional. Under that doctrine, that "Congress must 'speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.'"[153] While some have interpreted the doctrine as a presumption against certain sweeping agency actions, Justice Barrett has explained that "the doctrine serves as an interpretive tool reflecting common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."[154] Plaintiffs, for their part, argue that "due to the significant constitutional questions raised by the Final Rule, Defendants

---

[151] *Raich*, 545 U.S. at 22.

[152] *See* Am. Stewards of Liberty v. Dep't of the Interior 370 F. Supp. 711, 732 (W.D. Tex. 2019) (holding that, under *GDF Investments, Ltd.*, the FWS's regulation of bone cave harvestman as related to petition to remove harvestman from endangered species list did not exceed Congress's Commerce Clause authority). In *American Stewards of Liberty v. Department of the Interior*, the plaintiff challenged the U.S. Fish and Wildlife Services' regulations of the bone cave harvestman under the ESA. *Id.* The plaintiff argued, *inter alia*, that the regulation violated the Commerce Clause and contended that *Raich* and other Supreme Court precedent "altered the applicable test for evaluating regulations of noncommercial intrastate activity 'from a traditional Commerce Clause analysis,' analyzed under rational-basis scrutiny, to one that more closely scrutinizes regulations under the Necessary and Proper Clause." *Id.* at 733. The court held that although *Raich* "mention[s] the Necessary and Proper Clause . . . these passing references are not enough to shift the well-established Commerce Clause analysis." *Id.* at 735 (internal citations omitted).

[153] BST Holdings, L.L.C. v. OSHA, 17 F.4th 605, 617 (5th Cir. 2021) (quoting Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014)).

[154] Biden v. Nebraska, 600 U.S. 477, 511 (2023) (internal quotations omitted).

were required to identify clear statutory authority for regulating purely intrastate activities."[155]

But regardless of the doctrine's application, here, Congress has clearly delegated NMFS the authority to administer the ESA—and the Final Rule is a result of precisely that. Thus, the Major Questions doctrine does not undermine this Court's determination that the Final Rule passes constitutional muster.

## <u>CONCLUSION</u>

For the reasons just set forth, Plaintiffs' Motion for Summary Judgment (Rec. Doc. 30) is **DENIED**. Defendants' Motion for Summary Judgment (Rec. Doc. 31) is **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 27th day of June, 2025.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[155] Rec. Doc. 30-1 at 29 (citing *BST Holdings*, 17 F.4th at 617).